UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**ALLEN BLAND**,

                Plaintiff,

v.                                                                          **Case No. 14-cv-824-pp**

**OFFICER JOSEPH ESQUEDA,**
**OFFICER ERIN ILLEMAN,**
**OFFICER SCHEURING,**
**OFFICER SOMMER, and**
**CITY OF MILWAUKEE,**

                Defendants.

---

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 52) AND DISMISSING CASE**

---

Plaintiff Allen Bland was a state prisoner when he filed this case. On October 16, 2014, the court entered an order allowing him to proceed on Fourth Amendment claims for unlawful arrest and excessive force arising out of his arrest in 2010. Dkt. No. 7 at 2. On December 14, 2015, the defendants filed a motion for summary judgment, Dkt. No. 52, which now is fully briefed. For the reasons stated below, the court grants the defendants' motion for summary judgment.

**I.     FACTS**

The court takes the facts primarily from the "Defendants' Proposed Findings of Fact," which the plaintiff did not dispute. Dkt. No. 54. Instead of responding to each proposed finding of fact, the plaintiff filed a sworn document entitled "Plaintiff's Affidavit In Opposition To Defendant's

1

Declarations and Proposed Finding of Fact," which contains very few factual allegations relevant to the plaintiff's unlawful arrest and excessive force claims. Dkt. No. 59. The court also reviewed the "Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Brief in Support," Dkt. No. 58, and the Plaintiff's Amended Complaint, Dkt. No. 6, both of which are sworn. The court will set forth the plaintiff's relevant facts below.

    A.    <u>Confidential Informant</u>

At all times relevant to this case, Timothy Graham was a Detective employed by the Milwaukee Police Department. Dkt. No. 54, ¶1. On July 3, 2010, as part of an investigation into heroin distribution, Graham arrested a known heroin dealer from whom Graham had performed controlled purchases of heroin. <u>Id.</u> at ¶¶2-3. The individual Graham arrested subsequently became a confidential informant, and told Graham that he had the ability to purchase heroin from a "big player" in Chicago who went by the name "Big Baby." <u>Id.</u> at ¶¶5-7.

The confidential informant described "Big Baby" as a shorter, African-American male, with a stockier build and a medium complexion. <u>Id.</u> at ¶8. The confidential informant told Graham that he purchased heroin from "Big Baby" just a week or two before his arrest. <u>Id.</u> at ¶9. The confidential informant told Graham that "Big Baby" usually traveled as a passenger, with a second individual acting as driver. <u>Id.</u> at ¶10. The last time the confidential informant met with "Big Baby," "Big Baby" arrived in a blue Chevrolet Impala. <u>Id.</u> at ¶11.

The confidential informant described a typical drug purchase from "Big Baby." Id. at ¶¶12-16. A drug purchase from "Big Baby" began over the phone, sometimes with "Big Baby" contacting the purchaser and sometimes with the purchaser contacting "Big Baby." Id. at ¶12. "Big Baby" would not discuss drug transactions over the phone. Id. at ¶13. Instead, he would agree to meet on a certain date and would bring a large quantity of heroin to the prearranged meeting to allow the purchaser to buy however much the purchaser wanted. Id. "Big Baby" would call the purchaser when he was leaving Chicago and again when he exited the freeway in Milwaukee. Id. at ¶14. Only then would "Big Baby" tell the purchaser where to meet. Id.

"Big Baby" used codes to inform purchasers where to meet. Id. at ¶15. For example, if "Big Baby" told a purchaser he was "going for gas," it meant that "Big Baby" wanted to meet at a specific gas station. Id. If "Big Baby" told a purchaser he was "going for food," it meant that Big Baby wanted to meet at a specific restaurant location. Id. The confidential informant said the code "going for gas" meant to meet at a Citgo gas station located at 58th and Center Streets in Milwaukee, WI, and the code "going for food" meant to meet at Robert's Frozen Custard located on 60th Avenue in Milwaukee, WI. Id. at ¶16.

B. <u>Plaintiff's Arrest</u>

On July 5, 2010[1], with Graham present, the confidential informant placed a call to a Chicago area number that the confidential informant

---

[1] Paragraph 17 of the defendants' proposed findings of fact actually says that this phone call occurred on July 5, 2015. Dkt. No. 54 at ¶17. All of the other

3

identified as "Big Baby's" phone number. Id. at ¶17. During that call, the voice on the other end of the line (identified as "Big Baby") indicated that he would meet with the confidential informant in Milwaukee that evening. Id. at ¶18. Later that evening, the confidential informant placed another call to the same number; "Big Baby" said that he could not make it that evening but that he would come to Milwaukee the following day. Id. at ¶19. Graham did not consider the delay unusual, because inter-state drug deals often take several days between the first call and the day of the actual transaction. Id. at ¶20.

The next day, July 6, 2010, the confidential informant and "Big Baby" traded a number of calls which ultimately resulted in "Big Baby" telling the confidential informant he would be in Milwaukee that evening. Id. at ¶21. At approximately 5:00 p.m., "Big Baby" contacted the confidential informant to tell him that he was leaving Chicago for Milwaukee. Id. at ¶22. At approximately 6:48 p.m., "Big Baby" called the confidential informant to tell him that he was getting off the freeway in Milwaukee and that he was "going to get something to eat." Id. at ¶23.

Based on what the confidential informant had previously told Graham about the codes "Big Baby" used, this meant that "Big Baby" would be going to Robert's Frozen Custard. Id. at ¶24. Graham immediately traveled to Robert's Frozen Custard with the confidential informant and set up surveillance. Id. at ¶¶25-26. Graham also radioed and asked for four City of Milwaukee police officers to be in the area of Robert's Frozen Custard. Id. at ¶27.

events in the case transpired in 2010; the court assumes that this reference to 2015 is a typographical error.

4

At approximately 7:00 p.m., a blue Chevrolet Impala parked in the lot of Robert's Frozen Custard. Id. at ¶28. Two African-American males exited the vehicle and went into Robert's Frozen Custard, and the passenger matched the confidential informant's description of "Big Baby." Id. at ¶¶29-30. The confidential informant also visually confirmed that the man who had exited the passenger door of the Impala was "Big Baby." Id. at ¶30. The man the confidential informant identified as "Big Baby" is the plaintiff in this case, Allen Bland. Id. at ¶31.

When the two men exited the store and sat at an outside table to eat, Graham contacted the nearby police officers (Illeman, Esqueda, Sommer, and Scheuring) and asked them to approach the plaintiff and ultimately arrest him. Id. at ¶¶32-33. Graham had previously informed Illeman, Esqueda, Sommer, and Scheuring what he had learned during the course of his investigation. Id. at ¶34.

In full uniform, Illeman, Esqueda, Sommer, and Scheuring walked over to where plaintiff and the other suspect were eating. Id. at ¶35. Illeman and Esqueda approached the plaintiff while Sommer and Scheuring approached the second individual. Id. at ¶36. Illeman, Esqueda, Sommer, and Scheuring identified themselves as police officers and told the plaintiff and the other individual that they were under arrest. Id. at ¶¶37-38.

When Illeman and Esqueda approached the plaintiff, he stood up from the picnic table where he was seated and took one step away from the table into the parking lot. Id. at ¶39. The plaintiff then "bladed" himself to the

5

officers, which means he turned his body partially away from the officers in a defensive posture. Id. at ¶40. Based on his training and experience, Illeman interpreted this posture to mean that the plaintiff was either going to flee or fight the officers. Id. at ¶41. Illeman grabbed the plaintiff's arm to restrain him from fleeing the area. Id. at ¶42. In response, the plaintiff began swinging his arm in an effort to break Illeman's grip. Id. at ¶43. Esqueda then grabbed the plaintiff's right arm in an effort to assist Illeman. Id. at ¶44. The plaintiff gripped the arms of Illeman and Esqueda and began swinging his arms and twisting the officers in an attempt to break free. Id. at ¶45. The plaintiff pushed the officers and attempted to pull away from their grasp. Id. at ¶46. Illeman and Esqueda held on to the plaintiff in an attempt to control him and prevent him from fleeing. Id. at ¶47. The plaintiff continued to actively resist and attempt to pull away from the officers. Id. at ¶50.

Scheuring became concerned that Illeman and Esqueda were at risk of physical harm and that the plaintiff might escape custody. Id. at ¶51. Because Illeman and Esqueda were unable to subdue the plaintiff, Scheuring approached the plaintiff from the front and began ordering the plaintiff to "stop resisting," or words to that effect. Id. at ¶52. Then, because the plaintiff continued to actively resist Illeman and Esqueda and refused to comply with commands to stop resisting, Scheuring delivered a single knee strike to the plaintiff's front abdominal area. Id. at ¶¶53-54. The plaintiff dropped to one knee, and the officers were able to direct him to the ground using the weight of their bodies. Id. at ¶55.

6

Once on the ground, the plaintiff attempted to place his arms underneath his body. Id. at ¶57. The officers restrained the plaintiff by holding onto and controlling his arms. Id. at ¶58. After attempting to place his hands underneath his body, the plaintiff ceased resisting and relaxed his arms so that he could be placed in handcuffs. Id. at ¶ 59.

While on the ground, the plaintiff made a statement to the effect of "what you're looking for is in my pocket." Id. at ¶61; Decl. of McClain, Exhibit 1 at 25: 14-16; 9:8-11. When asked what he meant by this, the plaintiff responded, "the dope." Id. at 25: 18-19. The officers recovered $1,982.00 in U.S. currency and a plastic bag containing 48.81 grams of heroin (with an estimated street value of $9,762.00) from the plaintiff's pocket. Dkt. No. 54 at ¶63. The officers also found a telephone on the plaintiff, and the number matched the phone number for "Big Baby." Id. at ¶65. Graham subsequently spoke with the plaintiff and identified him as the voice on the other end of the line during the phone calls placed to and from the confidential informant. Id. at ¶64.

The plaintiff was criminally charged in State of Wisconsin v. Allen Bland, Milwaukee County case number 10-CF-003376. Id. at ¶66. During the plaintiff's criminal trial, he challenged the probable cause justification for his arrest. Id. at ¶67. Milwaukee County Circuit Judge David Borowski found that there had been probable cause for the plaintiff's arrest. Id. at ¶68.

C. Plaintiff's Facts

The plaintiff's sworn documents contain mostly legal arguments and legal conclusions, and often refer to claims on which the court did not allow the

7

plaintiff to proceed. Dkt. Nos. 6, 58, 59. The only actual facts the plaintiff proposes are as follows: On July 6, 2010, the plaintiff stopped at Robert's Frozen Custard to use the restroom and purchase an ice cream sundae. Dkt. No. 59 at 2. He took a seat in their secluded seating area and intended to peacefully enjoy his ice cream sundae with his friend and to have a private conversation. Id. Going back to the plaintiff's sworn amended complaint, the plaintiff also says that he and his friend were surrounded and intruded upon by four uniformed officers, the named defendants. Dkt. No. 6 at 9. He says the defendants used "excessive and unreasonable force," but he provides no details regarding the force used. Id.

**II.    DISCUSSION**

    A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

8

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Fourth Amendment Claims

At screening, the court limited the plaintiff to proceeding on his unlawful arrest and excessive force claims under the Fourth Amendment. Dkt. No. 7 at 2. The plaintiff's arguments in response to the defendants' motion for summary judgment are not limited to those claims. He continues to make arguments regarding claims on which the court did not allow him to proceed, and about defendants against whom the court did not allow him to proceed. The court will consider only the plaintiff's arguments regarding unlawful arrest (no probable cause) and excessive force.

The defendants submit that they are entitled to summary judgment on the plaintiff's claims. They argue that collateral estoppel precludes the plaintiff's unlawful arrest claims because the state court determined that probable cause existed in his criminal case. They also argue that the record contains ample evidence of probable cause to arrest the plaintiff, which spells

9

doom for an unlawful arrest claim. The defendants also argue that they did not use excessive force and that they are entitled to qualified immunity.[2] Finally, with regard to the plaintiff's claim against the City of Milwaukee, the defendants argue that this claim cannot survive summary judgment because the individual defendants did not violate the plaintiff's constitutional rights, and the plaintiff presented no evidence that the City of Milwaukee had a policy or custom of violating arrestee's constitutional rights.

1. Collateral Estoppel Regarding the Unlawful Arrest Claim

Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Guenther v. Holgreen, 738 F.2d 879, 883 (7th Cir. 1984) (quoting Montana v. United States, 440 U.S. 147, 153 (1979). Collateral estoppel applies, however, only when "the party against whom the earlier decision is being asserted had a 'full and fair' opportunity to litigate the issue in question." Id. (quoting Montana and Kremer v. Chemical Construction Corp., 456 U.S. 461, 481 n. 22 (1982). The doctrine of collateral estoppel "can be involved against a § 1983 claimant to bar relitigation of his Fourth Amendment search and seizure claim decided against him in a state criminal suppression hearing." Id.

The evidence submitted by the defendants includes a transcript of a

---

[2] The court does not analyze the defendants' qualified immunity argument, because it finds that collateral estoppel bars the plaintiff's unlawful arrest claim, and that all of his claims should be dismissed on their merits.

10

hearing that took place before Judge David Borowski in the Milwaukee County Circuit Court on September 16, 2010. Dkt. No. 52-2. A review of that transcript makes clear that the plaintiff's lawyer was arguing that evidence should be suppressed because the officers did not have probable cause to arrest the plaintiff. Two witnesses testified—Detective Graham and Officer Erin Illemann. The plaintiff was present at that hearing; his attorney had the opportunity to cross-examine both witnesses, and to make arguments. At the end of the hearing, Judge Borowski concluded, "I think there was probable cause in this case. I think it was a valid arrest. There was probable cause. I'm denying the defense request to suppress the evidence in this case." Id. at 70.

The plaintiff's claim that he was arrested without probable cause was actually and necessarily determined by a court of competent jurisdiction, after a full and fair opportunity to litigate. Thus, the plaintiff is collaterally estopped from bringing his unlawful arrest claim in this §1983 action.

### 2. Merits of the Unlawful Arrest Claim

The court also agrees with the defendants that, even if the plaintiff were not collaterally estopped from bringing this claim, probable cause existed. "In order to prevail on a claim of an arrest in violation of the Fourth Amendment, the plaintiff[] must show that [he was] arrested without probable cause; probable cause is an absolute defense to such a claim." Gonzalez v. City of Elgin, 578 F.3d 526, 537 (7th Cir. 2009) (citing Williams v. Rodriguez, 509 F.3d 392, 398 (7th Cir. 2007)). "A police officer has probable cause to arrest a person if, at the time of the arrest, the 'facts and circumstances within the

11

officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Gonzalez, 578 F.3d at 537 (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)).

"The probable cause determination must be made by a jury 'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" Chelios v. Heavener, 520 F.3d 678, 686 (7th Cir.2008) (citing Maxwell v. City of Indianapolis, 998 F.2d 431, 434 (7th Cir.1993)). Here, however, the facts regarding the probable cause for the plaintiff's arrest are undisputed.

The plaintiff repeatedly argues that Graham and the other Milwaukee police officer lacked probable cause to arrest him because their information about him was based on a tip from an unidentified informant, without any basis of ascertaining reliability.

In evaluating whether a tip is sufficient to establish probable cause, "a court must 'consider the informant's information—in amount and in degree of reliability—and the degree of corroboration of that information by officers.'" United States v. Huebner, 356 F.3d 807, 814 (quoting United States v. Navarro, 90 F.3d 1245, 1253 (7th Cir. 1996)). "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Alabama v. White, 496 U.S. 325, 330-31 (1990). Conversely, "[i]f an informant is shown to be right about some things, he is probably right about other facts that he has

12

alleged, including the claim that the object of the tip is engaged in criminal activity." United States v. Ganser, 315 F.3d 839, 843 (7th Cir. 2003).

In the plaintiff's case, the confidential informant provided detailed information regarding "Big Baby:" his physical description, his phone number, how he arranged his drug deals, his vehicle, how he traveled to Milwaukee, what his coded language meant, and where the deals would take place based on the code used. Also, by the time the defendants arrested the plaintiff, Graham had been able to confirm much of what the confidential informant said, including how he would arrive in Milwaukee, what color car he would be a passenger in, and where he would be based on the coded language he used.

In United States v. Huebner, 356 F.3d 807 (7th Cir. 2004), a confidential informant was arrested for possession of narcotics and subsequently told police that he had information about a drug supplier from whom he regularly made purchases. Id. at 809. In addition to the tips furnished regarding the dealer's drug deals, the informant "offered the police a wealth of detailed background information about the [dealer]." Id. The police worked with the confidential informant to arrange a drug deal with the dealer. Id. at 810. The Seventh Circuit concluded that, "[g]iven the highly detailed and thoroughly corroborated information pertaining to [the defendant's] illicit drug dealing activities that law enforcement officers acquired" from a known confidential informant, the officers could reasonably conclude that there was a fair probability that the defendant would have drugs in his vehicle, and thus concluded that probable cause existed to stop, arrest and search him. Id. at 816.

13

The same is true in this case. The detailed information provided by the informant allowed Graham to reasonably conclude that there was a "fair probability" that "Big Baby" was in Milwaukee to conduct a drug deal. Id. at 816. Thus, the officers had probable cause to arrest the plaintiff.

   3.   The Merits of the Excessive Force Claim

Claims that law enforcement officers used excessive force in the course of an arrest are analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386 (1989); see also Smith v. City of Chicago, 242 F.3d 737 (7th Cir. 2001). The reasonableness inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. The amount of permissible force depends on the specific situation, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

The Seventh Circuit has cautioned that "[s]ummary judgment is often inappropriate in excessive force cases" because "the parties typically tell different stories about what happened," Catlin v. City of Wheaton, 574 F.3d 361, 367 (7th Cir. 2009), and because "evidence surrounding the officer's use of force is often susceptible to different interpretations." Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010). That said, the plaintiff "bears the burden of proof on the constitutional deprivation that underlies the claim,

14

and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." Ault v. Speicher, 634 F.3d 942, 945 (7th Cir. 2011) (internal quotation marks omitted).

The plaintiff has made only a general allegation that the defendants used excessive force. He provides no factual detail regarding what the defendants did that he considers excessive force. If the plaintiff had evidence of excessive force, he should have submitted it in response to the defendants' motion for summary judgment. "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005) (internal quotation marks and citations omitted).

The undisputed facts reveal that when the officers approached the plaintiff's table, the plaintiff stood up, took a step away from the table into the parking lot, and turned his body partially away from the officers in a defensive manner. Dkt. No. 54, ¶¶39-40. When one of the officers grabbed the plaintiff's arm to keep him from fleeing the area, the plaintiff swung his arm to break the officer's grip. Id. at ¶43. When another officer grabbed the plaintiff's other arm, the plaintiff again swung his arms and twisted in an attempt to break free. Id. at ¶¶44-45. The plaintiff continued to actively resist and attempt to pull away from the officers so another officer approached the plaintiff and ordered him to stop resisting. Id. at ¶¶50, 52. Finally, because the plaintiff continued to resist and refused to comply with commands to stop resisting, an officer delivered a

15

single knee strike to the plaintiff's front abdominal area. Id. at ¶¶53-54. The plaintiff dropped to one knee, and the officers were able to direct him to the ground using the weight of their bodies. Id. at ¶55. While on the ground, the plaintiff attempted to place his arms underneath his body. Id. at ¶57. Only after the officers restrained the plaintiff by holding onto and controlling his arms did the plaintiff stop resisting and relax his arms so that he could be placed in handcuffs. Id. at ¶¶58-59.

Nothing in these undisputed facts supports the plaintiff's bare allegation that the force the officers used was unreasonable. Accordingly, the court will grant summary judgment on the plaintiff's excessive force claim.

    4.    <u>Merits of the Claim Against the City of Milwaukee</u>

Finally, the court turns to the plaintiff's claim against the City of Milwaukee under <u>Monell v. Dep't. of Social Services</u>, 436 U.S. 658 (1978). A <u>Monell</u> claim requires a plaintiff to allege facts sufficient to indicate that the government defendant had a municipal policy or practice that resulted in a constitutional deprivation. <u>Palka v. Shelton</u>, 623 F.3d 447, 455 (7th Cir. 2010) (citing <u>Christensen v. Cnty. of Boone</u>, 483 F.3d 454, 465 (7th Cir. 2007)). Because the court has concluded that the individual officers did not violate the plaintiff's constitutional rights, and because the plaintiff has not alleged any facts indicating that the City had any policy or practice regarding the way the plaintiff was arrested, the City of Milwaukee is not liable under § 1983. See id.

16

## III. CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment, Dkt. No. 52, and **DISMISSES** this case. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment.  The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of September, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge